UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| LYDIA VASQUEZ-BRENES and RICARDO BRENES,<br><br>Plaintiff(s),<br><br>v.<br><br>LAS VEGAS METROPOLITAN POLICE DEPARTMENT, et al.,<br><br>Defendant(s). | Case No. 2:12-CV-1635 JCM (VCF)<br><br>ORDER |

Presently before the court is defendant Las Vegas Metropolitan Police Department's ("LVMPD") and defendant Sean Miller's ("officer Miller's") motion for summary judgment. (Doc. # 50). Plaintiffs Lydia Vasquez-Brenes and Ricardo Brenes have responded (doc. # 56) and defendants have replied (doc. # 60).

**I.      Background**

This case arises out of an officer involved shooting. Plaintiffs are the wife and father of the decedent, Anthony Brenes ("Brenes"). Defendant officer Miller is the LVMPD officer who delivered the fatal gunshot to Brenes. The incident occurred in the early morning hours of November 15, 2010 at a Speedee Mart convenience store in Las Vegas, Nevada.

Plaintiff Lydia Vasquez-Brenes ("Lydia") testified in her deposition that Brenes woke her up that morning at approximately 5:00 a.m. to retrieve some checks from Mohave Mental Health Clinic. She testified that Brenes seemed angry when he woke her. When they left home together to catch the bus, Brenes brought with him a wooden walking cane. Lydia testified that she first saw the cane a few days prior and that Brenes had not used a cane previously.

. . .

. . .

**James C. Mahan**
**U.S. District Judge**

Upon boarding the bus, Brenes pointed the cane at the driver and said that he was disabled. The driver allowed Lydia and Brenes to board the bus without paying. At some point the couple got off the bus and walked towards the Speedee Mart.

Brenes entered the Speedee Mart and exited approximately ten seconds later. After exiting the Speedee Mart, Brenes and Lydia remained in the Speedee Mart parking lot. A driver witnessed Brenes pick up a "large rock" and throw it at the Speedee Mart sign. The driver perceived Brenes as being irate and apparently feared for the safety of the woman with him, Lydia. The driver spotted a nearby LVMPD patrol car, occupied by officer Miller, and stopped to relay his concerns.

Officer Miller drove to the Speedee Mart. Upon arrival he saw Brenes and Lydia standing on the corner of the intersection near the Speedee Mart sign. Brenes had the cane in his hand. Officer Miller activated his patrol car's lights, and briefly his siren, and asked Brenes to drop the cane and step in front of the patrol car. Officer Miller testified that Brenes was about three feet in front of the patrol car and responded to officer Miller's request by flexing his arms, clenching his fists around the cane, and "basically growling" at officer Miller while saying "come on, come on, you want some of this?" Officer Miller stated in his deposition that at this point he asked dispatch for backup,[1] pulled out his taser, and informed Brenes to stop moving or he would tase him. When Brenes continued to move towards officer Miller, officer Miller tased him. It had no effect on Brenes.

At some point after officer Miller initially tased Brenes, officers Chamberlin and Snodgrass arrived at the scene. Officer Chamberlin tased Brenes a second time and Brenes was unaffected. Officer Snodgrass also shot Brenes with two or three beanbag rounds. Brenes remained unaffected. The timeline of when the second tasing occurred and when the beanbag shots were fired is unclear. It is also unclear when the fatal shot was fired in relation to the second tasing and the beanbag shots.

. . .

---

[1] Officer Miller called in a "code red" which means an emergency situation.

James C. Mahan
U.S. District Judge

- 2 -

Officers Chamberlin and Snodgrass have since been dropped from this lawsuit with the filing of an amended complaint. (Doc. # 47). Plaintiffs have also conceded to dismissal of their *Monell* claim and their claims for false arrest and denial of medical care. (*See* opposition, doc. # 56 at 6).

The following claims remain: (1) a Fourth Amendment claim for excessive force against officer Miller brought under 42 U.S.C. § 1983; (2) a Fourteenth Amendment claim that officer Miller violated Brenes' substantive due process rights brought under 42 U.S.C. § 1983; (3) a battery claim against officer Miller and the LVMPD; and (4) a negligence claim against officer Miller and the LVMPD.

## II.     Legal Standard

The Federal Rules of Civil Procedure provide for summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323-24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court

1  need not consider the nonmoving party's evidence.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249-50.

**III.  Discussion**

   A.   *Fourth Amendment – excessive force (claim one)*

Plaintiffs' first claim seeks to hold officer Miller liable for violations of Brenes' Fourth Amendment rights.  Plaintiff brings this excessive force claim under 42 U.S.C. § 1983.  Relying on the doctrine of qualified immunity, officer Miller asserts he cannot be held liable on any of the federal claims.

. . .

**James C. Mahan
U.S. District Judge**

- 4 -

*1. Legal standard*

Where a plaintiff has stated a valid cause of action under 42 U.S.C. § 1983, government officials sued in their individual capacities may raise the affirmative defense of qualified immunity. *See Spoklie v. Montana,* 411 F.3d 1051, 1060 (9th Cir. 2005); *see also Goodman v. Las Vegas Metro. Police Dep't*, 963 F. Supp. 2d 1036, 1058 (D. Nev. 2013). Qualified immunity "balances two important interests–the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It protects government officials performing discretionary functions from liability for civil damages as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson*, 555 U.S. at 244.

Deciding whether an officer is entitled to qualified immunity is a two-step inquiry. First, the court assesses whether the plaintiff has alleged or shown a violation of a constitutional right. Second, the court decides whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson*, 555 U.S. at 232. The Supreme Court has instructed that district judges may use their discretion in deciding which qualified immunity prong to address first based on the circumstances of the case at issue. *See id.* at 236.

For the first step–whether officer Miller violated a constitutional right–this court looks to the Supreme Court's guidance on the excessive use of force in *Graham v. Connor*, 490 U.S. 386, 396 (1989).

*2. Analysis of Graham factors and the totality of the circumstances*

The court applies *Graham* by first considering the nature and quality of the alleged intrusion – the use of deadly force against Brenes. *See Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (citing *Deorle v. Rutherford,* 272 F.3d 1272, 1279-80 (9th Cir. 2001)). Deadly force is the most serious intrusion on a person's fundamental interest in life. *See Tennessee v.*

James C. Mahan
U.S. District Judge

1  *Garner*, 471 U.S. 1, 9 (1985).  Regardless of whether an officer's actions constitute deadly force, all that matters is whether the officer's actions were reasonable.  *Mattos*, 661 F.3d at 443.

To assess the reasonableness of officer Miller's actions, *Graham* instructs the court to give careful attention to the facts and circumstances of each particular case, including (1) the severity of the suspect's crime, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight.  *Deorle*, 272 F.3d at 1279-80.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer in the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  The court must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Mattos*, 661 F.3d at 442 (quoting *Graham*, 490 U.S. at 396-97).

Whether the use of deadly force is reasonable is highly fact-specific.  *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010).  Still, the inquiry is objective.  *Graham*, 490 U.S. at 397 ("[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them . . . ." (citation omitted)).  A reasonable use of deadly force encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable.  *Wilkinson*, 610 F.3d at 551 (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

*(a) Factor 1: Brenes did not commit any evident crime; any potential crime at issue was not severe.*

With respect to the first factor, officers did not pursue Brenes with the understanding that he had committed, or was in the process of committing, any crime.  Indeed, officer Miller responded to the location based on a driver's observation that Brenes tossed a "large rock" in the parking lot and the woman who was accompanying Brenes (Lydia) looked scared.  To the extent tossing a "large rock" at a Speedee Mart's sign constituted a crime, it is one of minimal severity.  There is also no evidence that Brenes had committed or was about to commit an act of domestic violence.  This factor weighs in favor of plaintiffs.

James C. Mahan
U.S. District Judge

- 6 -

*(b) Factor 2: There are disputed material facts surrounding whether Brenes posed an immediate threat to the safety of the officers.*

The second factor, whether Brenes posed an immediate threat to the safety of the officers or others, is the most important *Graham* inquiry. *See, e.g.*, *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005). An officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officers or others. *Garner*, 471 U.S. at 11.

An officer's good intentions will not make an objectively unreasonable use of force constitutional. *Graham*, 490 U.S. at 397. When the court considers whether an immediate threat existed, a "simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Mattos*, 661 F.3d at 441-42 (quoting *Deorle*, 272 F.3d at 1281.)

Based on the available surveillance videos, approximately two minutes passed from the time officer Miller first arrived at the Speedee Mart parking lot until the fatal shot. There are two camera angles that capture the incident. The first captures all but the final five seconds before the fatal shot. It is a clearer picture, but from the far side of the parking lot. The second provides what would be a close view of the final seconds leading up to the shooting and the shooting itself. Unfortunately, that camera is either dirty or damaged, so the video shows only blurry shapes and some movement by various figures.

The first camera shows the following: officer Miller arrives in his patrol car; approximately one minute and eleven seconds later officer Miller and Brenes become visible as they walk around the back end of the patrol car. Officer Miller is backing up around the patrol car with Brenes walking towards him. Approximately nine seconds later, Officers Chamberlin and Snodgrass arrive almost simultaneously and help officer Miller to surround Brenes. Brenes and the officers move in a zig zag fashion across the parking lot. Brenes turns and walks towards each officer at some point. They continue in this fashion for approximately thirty-five seconds, walking between officers Chamberlin and Snodgrass' patrol vehicles before moving out of view of the first, and clearest camera angle.

. . .

**James C. Mahan**
**U.S. District Judge**

- 7 -

The second camera angle shows officers Chamberlin and Snodgrass both arriving in separate patrol vehicles to provide backup. Approximately eighteen seconds later there is some noticeable movement in frame, but as mentioned above, the individuals are indistinguishable. It is difficult to even make out how many individuals are in frame. The blurry figures move from officers Chamberlin and Snodgrass' patrol cars towards the second camera. Approximately twenty-two seconds later the camera shows someone who must be Brenes slump and drop to the ground. The three surrounding figures hesitate for a moment and then move in systematically to handcuff Brenes.

It is undisputed that the officers attempted to subdue Brenes repeatedly by non-deadly methods. Officers Miller and Chamberlin both used their tasers at separate times on Brenes to no avail. Officer Snodgrass shot Brenes with two or three shotgun beanbag rounds. All three officers backed away from Brenes' advances over a period of more than one minute while continuously instructing Brenes to put down his weapon and to stop moving.

In the available camera footage Brenes appeared to walk at all times during the incident, even after he had been tased. It is unclear from the video when officer Miller first tased Brenes, when officer Chamberlin deployed the second taser, and when officer Snodgrass shot his beanbag rounds. Though he walked in a somewhat aggressive and quick manner changing directions sharply and unpredictably, Brenes did not appear to speed up, run, lunge, or swing at any of the officers. The parking lot is large and was mostly unoccupied during the incident. There appear to be no bystanders within Brenes' reach during the approximate two minutes over which the incident unfolded. The videos do not have audio, so one cannot hear what, if any, threatening statements Brenes made towards the officers.

The one video that does provide audio is from the camera on officer Chamberlin's taser. Brenes can be seen walking while at least one officer yells what sounds like, "Get on the ground! Get on the ground!" Immediately after, another officer yells what sounds like, "Go, go!" The taser wires appear to be attached to Brenes, and the clicking of the taser is audible. Brenes, seemingly unaffected by the taser, continues to walk. The video counter then skips ahead fifteen seconds, though it is disputed whether the video feed had any interruption. It appears that officer

Chamberlin dropped the taser as there is a "thud." Brenes is no longer visible and the camera lies sideways with a view of part of the Speedee Mart. An officer yells what sounds like, "Get on the ground right now!" and one clear shot rings. After a brief pause, an officer repeats, "Get on the ground," two more times. At the same time, one can hear another officer saying something indistinguishable and noise potentially from a police radio.

Many material facts surrounding Brenes' fatal shooting remain in dispute. It is unclear how close officer Miller was to the Speedee Mart wall at the time he decided to use deadly force against Brenes. Officer Miller may or may not have been partially entangled in his taser wires from his earlier discharge of the taser. Officer Miller's ability to continue to evade Brenes also might have been limited by other impediments and dangerous conditions such as a propane bottle, parking bumper, and sidewalk curb. There is some dispute regarding whether Brenes used the cane in an aggressive or threatening manner, or as a weapon, toward the officers.

Each of the three officers testified in their depositions that Brenes never swung the cane at any of them. The officers each gave slightly different descriptions of how Brenes held and used the cane, but they each agree that he did not lift the cane above his head or pull the cane back as if to wind up to strike them. The video does not clearly demonstrate the "tense, uncertain, and rapidly evolving" set of circumstances where the court can conclude that Officer Miller's use of deadly force was reasonable as a matter of law. *Cf. Wilkinson*, 610 F.3d at 550 (use of deadly force was reasonable as a matter of law where an officer saw his fellow officer lying on the ground and about to be run over by a minivan driven by the decedent, and the incident occurred in nine seconds).

Therefore, based on the available information, it is unclear whether Brenes truly posed an immediate threat to the officers. Viewing these events in the light most favorable to the plaintiffs as the non-moving parties, this factor weighs in favor of the plaintiffs.

*(c) Factor 3: Brenes actively resisted arrest.*

Turning to the third *Graham* inquiry, there is no question that Brenes resisted arrest. It is undisputed that Brenes refused to obey officer Miller's commands, and resisted arrest even after

James C. Mahan
U.S. District Judge

- 9 -

he had been warned, tased, and shot with beanbag rounds.  This factor weighs in favor of the defendants.

*(d) The totality of the circumstances does not demonstrate that officer Miller's use of deadly force was reasonable as a matter of law.*

The court must look to the version of the events most favorable to plaintiffs as the non-moving parties.  *Anderson*, 477 U.S. at 255.  Since it is unclear whether Brenes posed an immediate threat to the officers, it is possible that the opportunity to further engage in non-deadly options may have not expired when officer Miller made the decision to fatally shoot Brenes.  The officers potentially had the time and ability to attempt to use pepper spray, batons, and hand-to-hand takedown maneuvers against Brenes, or simply continue to maneuver away from Brenes, as they had done in the prior minutes.

After considering the severity of the force used, the three basic *Graham* factors, and the potential availability of other means to accomplishing the arrest, the court finds that a genuine issue of fact exists as to whether Brenes posed an immediate threat to the safety of the officers sufficient to warrant the use of deadly force.  Accordingly, the court may not make a determination that officer Miller's conduct was reasonable as a matter of law.

Further, the cases cited by defendants to justify officer Miller's use of deadly force are easily distinguishable.  For example, in *Wilkinson v. Torres*, the court held that an officer's deadly shooting was reasonable where the suspect fled from officers in a stolen minivan and drove the vehicle towards officers approaching on foot in an attempt to hit them.  *See Wilkinson*, 610 F.3d at 549.  In *Wilkinson*, the suspect posed an immediate threat to the officers by accelerating the minivan towards them as they approached on foot.  *See id.*  The suspect also posed an immediate threat to others by fleeing and engaging police in a car chase that required the use of multiple immobilization tactics.  *See id.*

In *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002), the circuit court found that the use of deadly force was justified where the suspect violently resisted arrest, physically attacked the officer, and tried to turn the officer's gun against him.  *See Billington*, 292 F.3d at 1185.  It was undisputed that the suspect was the aggressor, relentlessly beat the officer even when the officer tried to retreat, and attempted to take the officer's weapon.  *Id.*  Under these circumstances, the

**James C. Mahan**
**U.S. District Judge**

- 10 -

court found a reasonable officer would perceive a substantial and immediate threat of serious or deadly injury to him or herself. *Id.*

In *Reynolds v. Cnty. of San Diego*, 84 F.3d 1162, 1168 (9th Cir. 1996), the court held that the use of deadly force was reasonable where a suspect made a sudden, backhanded, upward swing with a knife against the officer who was attempting to subdue and disarm the suspect. *Reynolds*, 84 F.3d at 1168 (overruled on other grounds by *Acri v. Varian Assocs.*, 114 F.3d 999 (9th Cir. 1997)).

"Where a suspect threatens an officer with a weapon such as a gun or knife, the officer is justified in using deadly force." *City of Hemet*, 394 F.3d at 704. In each of the abovementioned cases there was no dispute that the suspect not only possessed a potentially deadly weapon, but also actively used that weapon against officers. In *Wilkinson*, the suspect attempted to hit officers with a car. *See Wilkinson*, 610 F.3d at 549. In *Billington*, the suspect violently attacked the officer and sought to turn the officer's own weapon against him, even when the officer attempted to retreat. *See Billington*, 292 F.3d at 1181-82. In *Reynolds*, the suspect suddenly swung at the officer with a knife when the officer was in the process of physically subduing the suspect. *See Reynolds*, 84 F.3d at 1168.

All three of these cases involved a suspect who unquestionably attempted to use a weapon to harm the officers involved. All three suspects were within striking range of the officers, or had made physical contact with the officers when deadly force was employed.

By contrast, Brenes' potentially dangerous weapon was a large cane. It is unclear whether Brenes even held or used the cane in a manner consistent with a weapon. While Brenes did appear to be erratic and at times walked in an aggressive manner towards the officers, he did not appear to speed up, run, or lunge at the officers. It is questionable whether Brenes was within a range where he would be able to strike the officers with the cane.

All three of the weapons in the abovementioned cases—a gun, a knife, and a car—lend themselves to posing a more significant and immediate threat of death or seriously bodily injury than a cane. This is not to say that no plausible scenario exists where a cane would be

James C. Mahan
U.S. District Judge

- 11 -

1  sufficiently dangerous to justify for the court the use of deadly force. As presented, however,
2  there is simply not enough information available to rule as matter of law.

3      B.    *Substantive due process (claim two)*

4  Plaintiffs allege that officer Miller's use of deadly force violated rights provided to them
5  by the Due Process Clause of the Fourteenth Amendment.

6  The Ninth Circuit has recognized that family members have a Fourteenth Amendment
7  liberty interest in familial companionship and society. *Wilkinson*, 610 F.3d at 554 (citing
8  *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991)). Official
9  conduct that "shocks the conscience" in depriving parents of that interest may be cognizable as a
10  violation of due process. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).

11  In determining whether excessive force shocks the conscience, the court must first ask
12  "whether the circumstances are such that actual deliberation [by the officer] is practical." *Id*. at
13  1137 (quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998)
14  (internal quotation marks omitted)). Where actual deliberation is practical, then an officer's
15  "deliberate indifference" may suffice to shock the conscience. *Id*. On the other hand, where a
16  law enforcement officer makes a snap judgment because of an escalating situation, his conduct
17  may be found to shock the conscience only if he acts with a purpose to harm unrelated to
18  legitimate law enforcement objectives. *Id*. at 1140. For example, a purpose to harm might be
19  found where an officer uses force to "teach [a suspect] a lesson" or to "get even." *Porter*, 546
20  F.3d at 1141.

21  Here, there is no evidence that officer Miller had any intent to cause harm to Brenes
22  beyond performing his legitimate law enforcement duties. This conclusion is supported by
23  officer Miller's initial and rather extended use of non-deadly force, and his repeated verbal
24  commands, which demonstrate an intent to subdue the suspect without serious harm or injury.
25  Regardless of whether officer Miller's ultimate decision to use deadly force was reasonable, his
26  actions do not demonstrate a purpose to cause harm that would "shock the conscience" and be
27  actionable under the Due Process Clause. Summary judgment is therefore granted in favor of the
28  defendant on plaintiffs' second claim.

**James C. Mahan**
**U.S. District Judge**

- 12 -

        C.      *State law claims for battery and negligence (claims three and four)*

Defendants primarily rest their summary judgment request on the remaining state law claims on the discretionary-function exception to Nevada's waiver of sovereign immunity. Defendants argue that Nevada precludes an officer's liability for state law torts committed as a result of discretionary actions. Plaintiffs argue that officer Miller's use of deadly force against Brenes violated the Constitution and is, therefore, not entitled to discretionary-function immunity under Nevada's exception.

        1.    *Discretionary-function immunity*

Nevada has generally waived its state immunity under Nevada Revised Statute ("NRS") § 41.031. The state's waiver of immunity is not absolute, and it has retained a "discretionary-function" immunity for officials exercising policy-related or discretionary acts. *See* Nev. Rev. Stat. § 41.032.[2]

In 2007, the Nevada Supreme Court adopted the United States Supreme Court's *Berkovitz-Gaubert* two-part test regarding discretionary immunity. *See Martinez v. Maruszczak*, 168 P.3d 720, 722, 728-29 (Nev. 2007). Under Nevada law, state actors are entitled to discretionary-function immunity under NRS § 41.032 if their decision "(1) involve[s] an element of individual judgment or choice and (2) [is] based on considerations of social, economic, or political policy." *Id.* at 729 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)). Federal courts applying the *Berkovitz-Gaubert* test "must assess cases on their facts, keeping in mind Congress' purpose in enacting the exception: "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *See id.* at 729 (quoting *Varig Airlines*, 467 U.S. at 814).

. . .

. . .

---

[2] NRS 41.032 states in relevant part that no action may be brought against a state officer or official which is "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary-function or duty on the part of the State or any of its agencies or political subdivisions . . . whether or not the discretion involved is abused." Nev. Rev. Stat. § 41.032(2).

James C. Mahan
U.S. District Judge

- 13 -

1    Decisions at all levels of government, including frequent or routine decisions, may be
2    protected by discretionary-function immunity so long as both criteria are satisfied. *Martinez*,
3    168 P.3d at 729. In analyzing discretionary-function immunity, a court does not ask whether the
4    officer abused his or her discretion, but only whether the acts concerned a matter over which the
5    officer had discretion. *See* Nev. Rev. Stat § 41.032(2); *Goodman v. Las Vegas Metro. Police*
6    *Dep't*, 963 F. Supp. 2d 1036, 1060 (D. Nev. 2013).

7    Police officers "exercise[ ] discretion and [are] thus generally immune from suit where
8    the act at issue requires 'personal deliberation, decision, and judgment,' rather than 'obedience to
9    orders, or the performance of a duty in which the officer is left no choice of his own.'" *Sandoval*
10   *v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1168 (9th Cir. 2014) (citing *Davis v. City of*
11   *Las Vegas*, 478 F.3d 1048, 1059 (9th Cir. 2007)). Acts which violate the Constitution are not
12   discretionary. *Goodman v. Las Vegas Metro. Police Dep't*, 963 F. Supp. 2d 1036, 1061 (D. Nev.
13   2013). Additionally, "where an officer's actions are 'attributable to bad faith, immunity does not
14   apply whether an act is discretionary or not.'" *Sandoval*, 756 F.3d at 1168.

15   Immunity attaches under the second criterion "if the injury-producing conduct is an
16   integral part of governmental policy-making or planning, if the imposition of liability might
17   jeopardize the quality of the governmental process, or if the legislative or executive branch's
18   power or responsibility would be usurped." *Martinez*, 168 P.3d at 729.  This court does not
19   determine a police officer's "subjective intent in exercising the discretion conferred by statute or
20   regulation, but [rather focuses] on the nature of the actions taken and on whether they are
21   susceptible to policy analysis." *Id.* at 728 (quoting *United States v. Gaubert,* 499 U.S. 315, 325
22   (1991)). Therefore, to satisfy the second criterion, the court need not consider whether officer
23   Miller "made a conscious decision regarding policy considerations." *Martinez*, 168 P.3d at 728.

24   Nevada looks to federal decisional law on the Federal Tort Claims Act for guidance on
25   what type of conduct discretionary-function immunity should protect. *Id.* at 727-28. The Ninth
26   Circuit has held that "decisions relating to the hiring, training, and supervision of employees
27   usually involve policy judgments of the type Congress intended the discretionary-function
28   exception to shield." *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000).

James C. Mahan
U.S. District Judge

- 14 -

1  With respect to plaintiffs' claims against defendant LVMPD, this court, relying on guidance from the Ninth Circuit, has specifically held that Nevada's discretionary-function immunity statute, NRS § 41.032(2), bars claims for negligent hiring, training, and supervision. *See Beckwith v. Pool*, case no. 2:13-cv-125-JCM-NJK, 2013 WL 3049070, *5-6 (D. Nev. June 17, 2013); *Cherry v. CCSD et al.*, case no. 2:11-cv-1783-JCM-GWF (D. Nev. Apr. 22, 2014); *Neal-Lomax v. Las Vegas Metro. Police Dep't*, 574 F. Supp. 2d 1170, 1192 (D. Nev. 2008) ("Because Nevada looks to federal case law to determine the scope of discretionary-function immunity, and because federal case law consistently holds training and supervision are acts entitled to such immunity, LVMPD is entitled to discretionary immunity on this claim."). Discretionary-function immunity, therefore, applies to the LVMPD with respect to the state battery and negligence claims and this court grants summary judgment in favor of defendant LVMPD on the basis of both state law claims.

Officer Miller's actions meet the first prong of the *Berkovitz-Gaubert* test. An officer's decision regarding the amount of force necessary under the circumstances is necessarily discretionary and requires an officer's individual judgment and choice. *Huff v. North Las Vegas Police Dep't*, 2:10-cv-01394-PMP-GWF, 2013 WL 6839421 (D. Nev. Dec. 23, 2013). Officer Miller had to make on-the-spot decisions when attempting to restrain and control Brenes based on Brenes' complete disregard of the officers' instructions. Officer Miller's decisions, therefore, were discretionary in nature. Additionally, officer Miller, in his repeated attempts to subdue Brenes through non-deadly methods, did not employ deadly force in bad faith.

Officer Miller's conduct does not meet the second prong of the test. Decisions regarding the amount of force to use are not the kind of policy decisions the discretionary-function exception was designed to shield. *See Huff*, 2013 WL 6839421 at *10; *cf. Gonzales v. Las Vegas Metro Police Dep't*, No. 61120 2013, WL 7158514 (Nev. Nov. 21, 2013) (declining civil liability for arresting a suspect who closely matched the description of a valid warrant).

This court sympathizes with the difficult split-second judgment calls involved with officer Miller's decision to attempt to subdue or arrest Brenes, who failed to abide by the officers' repeated instructions and requests to put down what they identified as a weapon and

James C. Mahan
U.S. District Judge

1  speak with them.  Police officers' individual assessments of how much force is necessary in a
2  given situation are not, however, an "integral part of governmental policy-making or planning."
3  *See Martinez*, 168 P.3d at 729.

4  Further, imposing liability on officers who exceed the permissible use of force does not
5  jeopardize the quality of the governmental process.  *See id.*; *see also Huff*, 2013 WL 6839421, at
6  *10.  Officer Miller's conduct, therefore, does not fall within § 41.032 and officer Miller is not
7  entitled to discretionary-function immunity on plaintiffs' state law claims for battery and
8  negligence.  The court, therefore, examines plaintiffs' negligence and battery claims against
9  officer Miller.

10  *2. Battery claim against officer Miller (claim three)*

11  Plaintiffs allege that officer Miller unlawfully battered Brenes.  Defendants seek
12  summary judgment on this claim by arguing that officer Miller's use of force was reasonable, or
13  in the alternative, that plaintiffs' battery claim should be dismissed because it is duplicative of
14  plaintiffs' 42 U.S.C. § 1983 claim.

15  Under Nevada law, a police officer is privileged to use the amount of force reasonably
16  necessary.  *See Yada v. Simpson*, 913 P.2d 1261, 1262 (Nev. 1996), *superseded by statute on*
17  *other grounds as recognized by RTTC Commc'n, LLC v. Saratoga Flier, Inc.,* 110 P.3d 24, 29
18  (Nev. 2005).  An officer who uses more force than is reasonably necessary is liable for battery.
19  *See Yada,* 913 P.2d at 1262; *see also Ramirez v. City of Reno*, 925 F. Supp. 681, 691 (D. Nev.
20  1996) (applying Nevada law).  Therefore, the standard for battery by a police officer under
21  Nevada law is the same as under a 42 U.S.C. § 1983 claim.

22  Because genuine issues of material fact exist regarding whether officer Miller used
23  reasonable force, the court must deny defendants' motion for summary judgment on plaintiffs'
24  battery claim.

25  *3. Negligence claim against officer Miller (claim four)*

26  To prevail on a claim for negligence, a plaintiff must generally show that: (1) the
27  defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; (3) the
28

**James C. Mahan**
**U.S. District Judge**

- 16 -

1  breach was the legal cause of the plaintiff's injury; and, (4) the plaintiff suffered damages.
2  *Scialabba v. Brandise Const. Co.*, Inc., 921 P.2d 928, 930 (Nev. 1996).

3  "Whether a defendant owes a plaintiff a duty of care is a question of law." *Id*.  Police
4  officers unquestionably owe a duty of care to the general public.  Because genuine issues of
5  material fact exist regarding whether officer Miller properly and adequately assessed the need to
6  detain, arrest, and use force or deadly force against Brenes, the court must deny defendants'
7  motion for summary judgment on plaintiffs' negligence claim.

8      D.    *Punitive damages*

9  Plaintiffs assert they are entitled to punitive damages as to their claims under 42 U.S.C. §
10 1983.  Plaintiffs concede that under NRS § 41.035(1) they are not entitled to punitive damages as
11 to their state law claims.

12 Punitive damages may be awarded under 42 U.S.C. § 1983 either when a defendant's
13 conduct was driven by evil motive or intent, or when it involved a reckless or callous
14 indifference to the constitutional rights of others.  *See Morgan v. Woessner*, 997 F.2d 1244, 1255
15 (9th Cir. 1993) (citation omitted).

16 "The standard for punitive damages under § 1983 mirrors the standard for punitive
17 damages under common law tort cases."  *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005)
18 (citing *Smith v. Wade*, 461 U.S. 30, 49 (1983)).

19 Nevada common law states that "[a] plaintiff is not automatically entitled to punitive
20 damages. Instead, punitive damages may be awarded when the plaintiff proves by clear and
21 convincing evidence that the defendant is 'guilty of oppression, fraud or malice, express or
22 implied.'"  *Bongiovi v. Sullivan*, 138 P.3d 433, 450 (Nev. 2006).  Oppression means despicable
23 conduct that subjects a person to cruel and unjust hardship with conscious disregard of the rights
24 of the person.  *Id.*

25 Plaintiffs' only remaining claim under 42 U.S.C. § 1983 is an excessive force claim
26 against officer Miller.  Because this court has found that genuine issues of material fact exist
27 regarding whether officer Miller used reasonable force, thee availability of punitive damages will
28

**James C. Mahan**
**U.S. District Judge**

- 17 -

depend on the evidence offered at trial. The parties' dispute over punitive damages is premature and the court declines to consider the issue at this time.

## IV. Conclusion

Viewing the version of events in the light most favorable to plaintiffs, the court cannot conclude that officer Miller's use of deadly force was reasonable as a matter of law. Summary judgment is DENIED as to plaintiffs' 28 U.S.C. § 1983 claim against officer Miller.

Because there is no evidence that officer Miller had an intent to cause harm as interpreted by this circuit's case law, summary judgment is GRANTED as to plaintiffs' substantive due process claim against officer Miller.

Because discretionary-function immunity applies to defendant LVMPD for its alleged negligent hiring, training, and supervision, summary judgment is GRANTED as to plaintiffs' state tort law claims against LVMPD.

Finally, because this court is unable to determine whether officer Miller's use of deadly force was a reasonable use of force, summary judgment is DENIED as to plaintiffs' state tort law claims against officer Miller.

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that defendants' motion for summary judgment (doc. # 50) be, and the same hereby is, GRANTED in part and DENIED in part, consistent with the foregoing.

DATED September 10, 2014.

_____
UNITED STATES DISTRICT JUDGE

**James C. Mahan**
**U.S. District Judge**